RUBY STEAMSHIP CORPORATION, LTD., Respondent, *v.* AMERICAN MERCHANT MARINE INSURANCE COMPANY, Appellant.

RUBY STEAMSHIP CORPORATION, LTD., Respondent, *v.* GLOBE AND RUTGERS FIRE INSURANCE COMPANY, Appellant.

First Department, November 23, 1928.

*Joseph M. Hartfield, T. Catesby Jones* and *James W. Ryan* of counsel [*Bigham, Englar & Jones*, attorneys], for the appellants.

*Chauncey E. Treadwell* of counsel [*Lampke & Stein*, attorneys], for the respondent.

In each case: Judgment and order affirmed, with costs, on the opinion of GAVEGAN, J., at Trial Term.

Present — DOWLING, P. J., MERRELL, MARTIN, O'MALLEY and PROSKAUER, JJ.; PROSKAUER, J., dissents.

The following is the opinion of the court below:

GAVEGAN, J. This is an action on insurance policies covering the British steamship *Hurona* which foundered November 25, 1919.

At the end of plaintiff's case defendants asserted there had been a failure to establish a loss contemplated by the policies, a loss through a peril of the sea.

Defendants challenged the propriety of admitting in evidence the " protest " before a foreign consul, apparently made right after the ship went down and in due course at the first available port, as supporting proof that the vessel had been lost and had been lost " through stress of weather in the Grecian Archipelago."

The protest sets out the circumstances as to " heavy weather " and " rough sea " which resulted, first in a beam breaking under the forecastle, then the flooding of the hold and finally the ship's foundering.

Together with the other proof, including Lloyd's lists and the evidence which shows that additional policies covering the same risk were paid as well as that the vessel never came back from the voyage and repatriation of the crew, the protest is admissible, and, on the whole case, a loss through a cause insured against is shown.

Plaintiff is a foreign stock corporation. Defendants insist this action cannot be maintained because, when plaintiff became a party to the policies, it was, as defendants assert, doing business in this State within the meaning of the licensing statute (Gen. Corp. Law, § 15, as added by Laws of 1927, chap. 425), but without having obtained a certificate from the Secretary of State.

The record shows that plaintiff was then maintaining an office in the city of New York, with telephone connections and cabling designation where at least one of its officers visited regularly, and that important activities of the corporation relating to the ownership and financing of the steamer *Hurona* were attended to in New York city. Outside of these activities and some corporate meetings evidently incidental thereto, I do not believe that plaintiff is shown to have been conducting in our State any business other than the operation of the vessel through an agency. This is, moreover, the fair inference of testimony, from an officer of plaintiff, that it was doing business in the State of New York.

It is clear that our State could not require plaintiff to comply with a licensing statute as a condition of operating the vessel in foreign commerce between this and other countries. (*Crutcher* v. *Kentucky,* 141 U. S. 47.)

In this connection, therefore, defendants' reliance must be such business as the plaintiff conducted in relation to the ownership and financing of the vessel, separate and apart from its operation. The financing was merely an incident of ownership or control and is not to be considered as disassociated therefrom.

The New York licensing statute would not defeat a recovery by plaintiff merely because it owned, held or controlled personal property.

It is by no means obvious that its business of operating the *Hurona* may be regarded as separate and apart from her ownership and control. But, assuming that this may be done, defendants are confronted with the fact that control of the vessel, whether by ownership, by contract or otherwise, is an essential element of its operation. Furthermore, even conceding that ownership or control may be regarded as distinct from operation, a requirement of licensing to conduct such distinct business could not be imposed by one of the States as a condition of plaintiff's operating the vessel

in foreign commerce; for the State, neither directly nor indirectly, may so regulate interstate or foreign commerce. Indirect regulation would be implied if anything to be done in the regular operation of the vessel could not legally be done, under the State law, without obtaining a license to conduct other business which might be regarded as outside the scope of interstate commerce. To suggest that the statute forbids recovery in a matter strictly a part of commerce because of plaintiff's engagement in other business without a license would be to suggest that the State might bring about indirectly the effect of the restriction it has not the right to directly impose. It would be wholly inconsistent to hold plaintiff free to make a contract, which was a necessary part of the operation of the vessel, without regard to the licensing statute, and at the same time to hold that it cannot recover on such contract because of other activities which it might not conduct without complying with the licensing statute. A foreign corporation may not be hindered by a State from operating a vessel in interstate or foreign commerce, from which it follows that such operation may not be restricted because of the owner's failure to obtain a license to conduct other business which is not embraced within the category of interstate or foreign commerce.

" A corporation of one State may go into another, without obtaining the leave or license of the latter, for all the legitimate purposes of such commerce." (*Dahnke-Walker Co.* v. *Bondurant*, 257 U. S. 282, 291.)

" As to its foreign or interstate transactions, a foreign corporation is not required to comply with statutes providing that it shall obtain a permit to do business within the State." (12 C. J. 60; § 71.)

In regular course, the business of running the steamer to foreign ports required that insurance be procured and maintained just as much as it required that the ship be victualled. Insurance is a necessary part of the ordinary operation of a vessel in foreign commerce. It is clear that plaintiff's business of running the vessel, including provisioning it and insuring it, was " strictly commerce, interstate or foreign." (*People ex rel. Southern Cotton Oil Company* v. *Wemple*, 131 N. Y. 64, 70, 71.) In these respects its activities were " those of interstate commerce exclusively." (*International Text Book Co.* v. *Tone*, 220 N. Y. 313.)

Counsel for defendants repeatedly cites *Nutting* v. *Massachusetts* (183 U. S. 553) to the effect that " A contract of marine insurance is not an instrumentality of commerce, but a mere incident of commercial intercourse." (P. 556.)

This and similar statements must be properly understood. A foreign insurance company issuing to a person in this or another

State a policy of marine insurance is conducting an insurance business. It is held not to be engaged in interstate or foreign commerce so as to relieve it from the necessity of complying with State statutes intended to regulate the insurance business for the protection of insurers. From the point of view of the insurance company the policy is not an instrumentality of commerce. But from the point of view of the owner and operator of the ship, it is an indispensable and integral element of the foreign commerce in which the vessel is engaged.

It is argued that plaintiff did not have an insurable interest. There is some conflict as to whether the bill of sale of the vessel had actually been delivered; but there can be no doubt of plaintiff's beneficial ownership as well as of its investment far in excess of the amount of these policies. For defendants it is intimated that this investment was made with borrowed money or, possibly, from freight receipts. All this fails to bear out the statement that plaintiff had no insurable interest. Such an interest is established in many ways throughout the record.

It is important, however, to note the particulars as to the indorsement making plaintiff a party to the coverage; and the following is taken from defendants' brief:

" All these policies were issued originally in the name of ' Charles M. Barnett for account of whom it may concern, loss, if any, payable to Williams Steamship Company, Inc.' * * * Thereafter, on or about August 29th, 1919, a further endorsement was attached to and made a part of the Globe & Rutgers Fire Insurance Company's policy and agreements similar to said endorsement were accepted by the American Merchant Marine Insurance Company, though never actually attached to their two policies, whereby it was ' understood and agreed that the Ruby Steamship Corporation who hold contract to purchase this vessel, are included in the loss payable clause hereunder, as their interest may appear.

" ' It is further understood and agreed that the Ruby Steamship Corporation are permitted to insure, for account of others, to protect total acceptances in respect to advances freight £60,000 on anticipated earnings P. P. I. per this vessel, at and from Newport News to ports and/or places in Cuba, and at and thence to New York (vessel already on voyage) without prejudice to this insurance. * * * All other terms and conditions of policy remaining unchanged.' "

The effect of all this defendants would have the court hold was to render plaintiff a mere appointee or agent to receive payment for other interests, said to be solely insured, of any amount to be paid on account of loss. Therefore, defendants say, surrender of

the policies by Williams Steamship Co., Inc., which took out other insurance not covering plaintiff, is a complete defense to these actions. Being merely such an appointee or agent, as it is argued, plaintiff would have no standing after such " surrender " of the insurance whether or not it consented to the action of Williams Steamship Co., Inc., in surrendering the policies.

This argument is wholly without merit because the record is consistent with no other conclusion than that plaintiff had an insurable interest; and the indorsements show such interest and make the Ruby Company a party the *stated* interest of which is covered by the policies. As one holding a " contract to purchase the vessel " it is on the face of the policies the equitable or beneficial owner. Indeed, to it all persons looked for the payment of premiums and it was obligated to pay them by the contract of purchase. It might have the interest disclosed by the indorsements without having the record title. Under the provisions of the indorsements it was not a mere appointee or assignee to receive proceeds of policies. It was one of the persons insured, furnished with assurance against loss of its own interest and not merely in the position of being allowed to participate as assignee or appointee of someone else in interest.

It is difficult, moreover, to reconcile the suggestion that the Ruby Company was a mere appointee without any interest with the fact that it was granted permission to obtain other insurance for which such permission seems to have been requisite.

It also is proved that the vessel was operated for plaintiff and was in plaintiff's possession.

The argument for defendants closely approaches the point of urging that plaintiff was a mere appointee or agent of Barnett, the former registered owner, or his power of attorney, the Williams Company, and at the same time Barnett or the Williams Company was plaintiff's authorized agent to surrender plaintiff's interest in the policies. Neither of these conceptions is proved.

A more serious contention for defendants is that plaintiff consented to the surrender of the policies as a result of its having been and continuing to be unable to pay premiums. A premium which should have been paid by it became due May 12, 1919. It was not paid and a second quarterly premium became due August 12, 1919. Neither of these was paid until October 24, 1919, when payment was made out of a loan on the vessel advanced by the Equitable Trust Company in the sum of $250,000. Prior to October 24, 1919, there was a conference between certain officers and representatives of plaintiff, the agent of Johnson & Higgins, brokers who were endeavoring to collect the premiums, and the

president and another officer of the Williams Steamship Co., Inc., which still held a mortgage on the ship. Cancellation notices for non-payment of premiums had been served before the loan was obtained. These were five-day notices. They were sent out on October 15, 1919, and gave the five days' notice of cancellation for non-payment of premiums contemplated by the policies, becoming effective on October 20, 1919, the time being subsequently extended. The said officers of the Williams Steamship Co., Inc., became parties to the loan on the side of the *borrower*, apparently by indorsing notes, the cancellation notices were withdrawn and, as has been stated, the premiums due May 12 and August 12, 1919, were paid.

It is asserted for defendants, but I do not find it to be correct, that the cancellation notices were withdrawn on an alternative condition, that there be payment or guarantee of payment of the third quarterly premiums on the due date, November 12, 1919, or that the policies be surrendered for cancellation; that plaintiff was informed of an arrangement between the Williams Steamship Co., Inc., and the brokers that if the said quarterly premiums should not be promptly paid when they became due on November 12, 1919, or their payment satisfactorily guaranteed, the policies would be surrendered; and that the Ruby Company acquiesced in and consented to such arrangement.

The proof falls far short of showing that plaintiff became a party to any such agreement for surrender of the insurance. It is more likely that the brokers for their own protection were most anxious to get in premiums so far as same had been already fully earned and that it is an afterthought to say that plaintiff stipulated for immediate surrender on a failure to pay the November premiums the instant they became due or on a failure to have such payment acceptably guaranteed. According to defendants' witness Spielberg, plaintiff's representatives stated that it was incumbent on the Williams Company and its associates to protect their own interests and that plaintiff's representatives " were going to take care of their interests as they went along."

Basing his inferences upon the same conclusions of fact, which I do not adopt, counsel for defendants would have me find that the notices of cancellation of October 15, 1919, had been withdrawn on the understanding that the policies would be canceled immediately if the third quarterly premiums were not paid or if payment thereof should not be acceptably guaranteed on November 12, 1919, and that, as a result, the consideration for insurance after November 12, 1919, noon, was to be changed from a promise to pay premiums to actual payment thereof. By such curious

reasoning, not supported in fact, counsel would lead the court to hold that there was a failure of consideration. The truth is that in this respect the policies are no different from ordinary property insurance policies and that failure to pay the premiums, while a ground for cancellation, does not in itself have the effect of discontinuing the coverage. If there had been an agreement to waive the provision for five days' notice of cancellation we would expect to find some letter or other writing to that effect. It is improbable that so important a matter would be treated so loosely.

In reference to the asserted cancellation and surrender of the policies, defendants seem to claim Johnson & Higgins as their agents, though the answer denies that Johnson & Higgins represented defendants or had any authority to represent them " at any time."

Defendants also rely on alleged cancellation for non-payment of premiums. The wording of the policies here in point is: " In event of non-payment of premium thirty days after attachment, this policy may be cancelled by the assurers upon five days' written notice being given the assured."

Under date of November 7, 1919, Johnson & Higgins sent plaintiff a bill for the premium to fall due November 12, 1919, with a letter stating that if they were not paid before noon of that day the insurance would be immediately canceled. A letter of similar import had been sent under date of November 3, 1919, to an officer of the Ruby Company as well as another letter to like effect under date of November 3, 1919, to Williams Steamship Co., Inc. Under date of November 18, 1919, Johnson & Higgins notified the Ruby Company by letter that the policies were being returned for cancellation and " that there no longer exists on this vessel any insurance arranged by this office." There is also evidence in the case indicating that while the policies were ostensibly canceled for non-payment of premiums they were really surrendered by Williams Steamship Co., Inc.

No notice was sent the Ruby Company or any one on its behalf to the effect that the insurance would be canceled if past due premiums were not paid within a stated period. The clause quoted above indicates that the company reserved the right to cancel " in event of non-payment of premium."

Apparently it is defendants' position that said clause relates only to the first quarterly premium; and undoubtedly " thirty days after attachment " refers to the thirty days following the time when the policies went into effect. But in the first place, I believe it to be the general custom, in the absence of provisions to the contrary, that notice that there will be a cancellation for non-

payment of premium is not to be served in advance of the premium becoming due. Notice after cancellation is not a compliance with the terms of the policies. · It was not sufficient to threaten cancellation in advance of the due date and to follow thereafter with a notice that the policies had been canceled.

Secondly, assuming that the provision for thirty days' grace applies only to the first quarterly installment of premium, the cancellation clause nevertheless provides for "five days' written notice," "in event of non-payment of premium," which means after a failure to pay premium.

Again, the cancellation clause contained in the forms of policy employed seems to have been intended to fit cases where annual premiums are payable in advance at one time for the entire year. Continuing to use the same form, though the coverage is to be paid for quarterly, would lead fairly and properly to an implication that the clause be read in a sense making it applicable and intelligent in the particular case. This would imply that there be thirty days' grace as to each quarterly premium; and from defendants' Exhibit L we see that there evidently was in this case a modification of a practice of requiring the payment of premiums for an entire year in advance. That the provision for quarterly payments does not appear in the policies, but was otherwise covered, indicates that the policies, as printed, were not intended to be literally applicable in cases where the premiums should become due in installments.

There is some suggestion to the effect that the Ruby Company's interest had been terminated as a result of non-payment in due course of the loan obtained from the Equitable Trust Company, but defendants' proof is that the loan was *paid* out of the new insurance. Furthermore, whatever was done on the basis of the mortgage occurred after the loss on November 25, 1919, and after plaintiff's rights in suit had become fixed. Again, I see nothing in the pleadings which would justify me in entertaining any such suggestion.

It should also be noted that several other matters suggested by the argument for defendants are not within the pleadings, were not litigated and were not covered by the proof in a manner sufficient to be of any assistance to defendants.

Judgment will be directed for plaintiff, orders to be settled. No extra allowance will be granted.